UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

KATRINA DAWN JETER            CIVIL ACTION 2:17-CV-00474

VERSUS                        JUDGE JAMES

U.S. COMMISSIONER, SOCIAL     MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

REPORT AND RECOMMENDATION

I.    Background.

    A.    Procedural History

    Katrina Dawn Jeter ("Jeter") filed an application for Social Security Widow's

Insurance Benefits ("WIB") on June 10, 2014, alleging a disability onset date of

August 1, 2011 (Doc. 8-1, pp. 118-19/312) due to fibromyalgia, hypothyroidism, high

blood pressure, and high cholesterol (Doc. 8-1, p. 135/312).  That application was

denied (Doc. 8-1, p. 63/312).

    A *de novo* hearing was held before an Administrative Law Judge ("ALJ") on

June 16, 2015, at which Jeter appeared with her representative and a vocational

expert ("VE") (Doc. 8-1, pp. 27-28/312).  The ALJ found that Jeter is the unmarried

widow of the deceased insured worker and has attained the age of 50, she is within

the prescribed period, and she has not engaged in substantial gainful activity since

August 1, 2011 (Doc. 8-1, p. 17/312).  The ALJ further found that Jeter suffers from:

open angle borderline glaucoma findings; cataract; hypothyroidism; obstructive sleep

apnea; hypertension; fibromyalgia; history of transient ischemic attack ("TIA"); and

mild stroke (possibly related to her MTHFT genetic defect).  The ALJ concluded that Jeter does not have a severe impairment or a combination of impairments that significantly limits her ability to perform basic work-related activities for 12 consecutive months and, therefore, was not under a disability as defined in the Social Security Act at any time from August 1, 2011 through the date of the decision on October 23, 2015 (Doc. 8-1, pp. 18, 24/312).

Jeter requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 8-1, p. 4/312).  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Jeter next filed this appeal for review of the Commissioner's final decision. Jeter raises the following issues for review:

1. The ALJ erred in finding Jeter has worked for the last 15 years cleaning her church and earning $ 385 per month.  Jeter only worked two months in 2005.

2. The ALJ erred in finding Jeter wears contact lenses and has 20/20 vision, since she wears glasses and has 20/40 vision with correction.

3. The ALJ erred in finding Jeter was not diagnosed with arthritis.  She was diagnosed with polyarthritis and carpal tunnel syndrome.

4. The ALJ erred in finding Jeter has cared for her two grandchildren since September 2013.  Jeter's grandchildren and their father have lived with her since that time, and Jeter assists in only a limited manner.

5. The ALJ erred in finding Jeter was seen for a follow-up appointment on May 2, 2012 by Dr. Hajmurad, who found she was doing well and taking her medication intermittently.  Instead, Dr. Hajmurad reported Jeter was doing better but had significant cervical spondylosis and degenerative disc disease, continued to need medication for pain, was taking her pain medication as needed (not on a regular basis), and was reporting for physical therapy.

6. The ALJ erred in finding Jeter was admitted to St. Francis Cabrini Hospital for a stroke, where it was reported she was issued a C-PAP with which she was

2

no longer compliant, although using it had improved her gait and weakness. Jeter contends the references to her gait and weakness were unrelated to her C-PAP.

7. The ALJ erred in finding she had a diagnosis of hypothyroidism that did not indicate other symptoms such as hair loss, sensitivity to cold, constipation, or dry skin, and was prescribed medication that was non-therapeutic. Instead, the medical records note symptoms of: fatigue; pain; muscle weakness; tenderness and stiffness; heavier than normal menstrual periods; and impaired memory, which are all symptoms of hypothyroidism. Also, her medication was erroneously refilled at the wrong dosage, which suppressed her TSH levels.

8. The ALJ erred in finding the diagnosis of fibromyalgia was not supported by trigger points. Dr. Hajmurad treated Jeter for fibromyalgia due to her reported trigger points in the cervical area, back, arms, thighs, and feet.

9. The ALJ erred in finding Jeter's pain was reduced and her energy was increased in November 2014 and February 2015. Both medical records showed continued complaints of fatigue, chronic pain, and weakness.

10. The ALJ erred in finding Jeter's medical records do not reflect any treatment for a medically determinable mental impairment. Jeter suffers from fiber fog, a symptom of fibromyalgia that causes mental and memory problems, that was documented by Dr. Donovan multiple times.

11. The ALJ erred in finding there were no diagnoses of: plantar fasciitis and spurs in her feet; frequent vaginal yeast infections with pain; prediabetes (now diabetes); and restless leg syndrome. Dr. Hajmurad made those diagnoses.

Jeter and the Commissioner both filed briefs (Docs. 10, 11, 12). Jeter's appeal is now before the Court for disposition.

**B     Medical Records**

Jeter was evaluated in December 2011 by Dr. Riad Hajmurad, a neurologist, for complaints of back pain radiating down to both lower extremities, more on the right, foot pain, numbness in her hand, and some neck pain (Doc. 8-1, p. 177/312). Her symptoms were worse at night (Doc. 8-1, p. 177/312). Jeter had been hit by a

vehicle about six months before and prescribed a muscle relaxant that she was taking, and pain medication that she was not taking because she needed to be able to drive (Doc. 8-1, p. 177/312).  An MRI showed mild scoliosis, degenerative disc disease at L5-S1, mild stenosis at L3-L4, and some annular fissure tear at L5-S1, but no active radiculopathy (Doc. 8-1, p. 178/312).  An EMG and nerve conduction velocity study showed minimal chronic changes at L5-S1 (Doc. 8-1, p. 178/312).  Jeter had normal motor strength in the upper and lower extremities (Doc. 8-1, p. 178/312).   Dr. Hajmurad was unable to find a cause for Jeter's upper extremity numbness, but he stated the low back pain may be related to a bulging disc (Doc. 8-1, p. 178/312).

In February 2012, Dr. Hajmurad prescribed physical therapy and started Jeter on Neurontin and Norco (Doc. 8-1, p. 176/312).  In May 2012, Dr. Hajmurad noted Jeter was doing fairly well on her medication, although she was not taking it regularly (depending on her level of pain) (Doc. 8-1, p. 173/312).   Jeter's physical therapy was continued (Doc. 8-1, p. 174/312).

In April, May, and December 2013, Jeter was diagnosed with a left eye cataract and borderline glaucoma findings in her right eye (Doc. 8-1, pp. 282, 286, 287/312).

In January 2014, Dr. David Remedios, a general surgeon, reviewed Jeter's bloodwork and found her triglycerides were elevated, her insulin level was slightly elevated, and her free T4 was slightly elevated, and prescribed L-methylfolate (folic acid), Lisinopril for hypertension, Synthroid for hypothyroidism, Lipitor for high cholesterol, and Vitamin D3 (Doc. 8-1, p. 312/312).

In March 2014, Jeter was hospitalized for two days due to a TIA (Doc. 8-1, pp. 239-256/312). Jeter had obvious right-sided weakness ((Doc. 8-1, p. 256/312). An MRI of the brain did not reveal any acute intracranial process, and a carotid Doppler did not reveal any significant stenosis (Doc. 801, p. 239/312). Jeter's weakness and unsteady gait improved within two days (Doc. 8-1, p. 239/312). Jeter was also diagnosed with hyperlipidemia, hypothyroid disease, grieving/adjustment disorder, fibromyalgia, hypertension, prediabetes, and hypokalemia (Doc. 801, p. 239/312). Jeter was prescribed Synthroid, Lipitor, Divan/hydrochlorothiazide, aspirin (daily), and Tylenol (Doc. 8-1, p. 240/312).

In May 2014, Jeter's triglycerides and cholesterol were improved, but her Vitamin D level was still very low, she was feeling fatigue, and she was having some trouble swallowing (Doc. 8-1, p. 311/312). Dr. Remedios noted that Jeter's neurologist had told her she may have fibromyalgia (Doc. 8-1, p. 311/312). Jeter's medications were continued (Doc. 8-1, p. 311/312).

In June and July 2014, Jeter saw Dr. Timothy J. Donovan[1] about her complaints of pain, headaches, fatigue, falls, and difficulty sleeping, and reported a probable tick bite (Doc. 8-1, pp. 185-188/312). Dr. Donovan noted Jeter's "problems" of idiopathic polyarthritis and myalgia/myositis-multiple (Doc. 801, p. 187/312), and her complaints of tossing and turning, poor sleep, poor memory, occipital headaches, "electric" sensations, myalgia, fatigue, a probable tick bite, falls, inguinal femoral

---

[1] Dr. Donovan's license to practice medicine was suspended beginning in February 2017.

tenderness, polyarthritis, polymyalgia, and a history of stroke (Doc. 8-1, p. 189/312). Lab work (low TSH) confirmed Jeter has hypothyroidism (Doc. 8-1, p. 191/312). Dr. Donovan diagnosed: (1) unspecified poly arthropathy or polyarthritis;[2] (2) myalgia/myositis (unspecified); and (3) history of CVA (personal history of TIA and cerebral infarction without residual deficits) (Doc. 88-1, p. 189/312). Dr. Donovan prescribed Cymbalta and Doxycycline (Doc. 8-1, pp. 185-188/312). Jeter was also prescribed Levothyroxine for her hypothyroidism (Doc. 8-1, pp. 191-194/312).

Sleep studies in July and August 2014 showed Jeter has obstructive sleep apnea (Doc. 8-1, pp. 236, 267/312), and a CPAP was prescribed (Doc. 8-1, pp. 233-34/312).

In August 2014, Jeter reported increased energy with vitamin D and folate, and decreased pain, although Jeter still had restless leg syndrome (Doc. 8-1, p. 259/312). Dr. Donovan diagnosed lymphadenopathy (swollen lymph nodes), myalgia (muscle pain), and a vitamin D deficiency (Doc. 8-1, p. 259/312).

Also in August 2014, Dr. Remedios noted Dr. Donovan's diagnosis of Lyme disease and continued Jeter's medications (Doc. 8-1, p. 310/312). By September 2014, Jeter was sleeping better (Doc. 8-1, p. 260/312). Dr. Remedios diagnosed MTHFR,[3]

---

[2] Polyarthritis is arthritis involving two or more joints. Poly arthropathy is a disease involving two or more joints. Merriam-Webster Medical Dictionary: Polyarthritis; Arthropathy, *available at* https://www.merriam-webster.com/medical/polyarthritis.

[3] Methylenetetrahydrofolate reductase variant. MTHFR is a gene. We all carry two copies of *MTHFR*. *MTHFR* tells our body how to create an enzyme involved in breaking down the amino acid homocysteine. As is true for any gene, the DNA code of the *MTHFR* gene can vary. When we identify a part of the sequence that varies, we call it a "variant." Genetic research aims to identify specific variants that cause harm or benefit to health. People with common MTHFR variants can have normal or elevated levels of homocysteine in their blood or urine. MTHFR variants and elevated homocysteine

lymphadenopathy, vitamin D deficiency, and hypothyroidism (Doc. 8-1, p. 260/312). Dr. Donovan refilled her medications (Doc. 8-1, p. 215/312).

In September 2014, Dr. Donovan found Jeter was sleeping better and had more energy (Doc. 8-1, p. 260/312). Jeter still had mild axillary lymphadenopathy (Doc. 8-1, p. 260/312). Dr. Donovan diagnosed MTHFR, lymphadenopathy, vitamin D deficiency, and hypothyroidism, and found Jeter was doing well on Cefzil and folate; and he added Diflucan (Doc. 8-1, p. 260/312).

In October 2014, Jeter was still suffering from fatigue, hypothyroidism, and MTHFR, but was sleeping better, had increased energy, and was taking her medications (Doc. 80-1, p. 261/312). Dr. Donovan prescribed folate, the medications for her lymphadenopathy were changed, and she was sent for lab tests on her hypothyroidism (Doc. 8-1, p. 261/312). In November, Jeter's cholesterol was up again because she had stopped taking Lipitor due to her Lyme disease treatment (Doc. 8-1, p. 309/312). Dr. Remedios instructed Jeter to resume taking Lipitor as soon as Dr. Donovan said it was safe (Doc. 8-1, p. 309/312).

In February 2015, Jeter's pain and fatigue were reduced, her gait and memory were improved, and she was more active socially, but her hips and knees still hurt (Doc. 8-1, p. 262/312). Jeter was diagnosed with hypothyroidism, fatigue, vitamin D deficiency, chronic myalgia, and MTHFR (Doc. 8-1, p. 262/312).

---

levels have been studied as *risk factors* for a number of health conditions. National Center for Advancing Translational Sciences, Genetic and Rare Disease Information Center: "MTHFR gene variant," *available at* https://rarediseases.info.nih.gov/diseases/10953/mthfr-gene-mutation#ref_3940 (a service of the U.S. Dept. of Health and Human Services and the National Institutes of Health). 269 F.3d 520

In January and May 2015, Jeter had borderline glaucoma findings in the right eye and a cataract in the left eye (Doc. 8-1, pp. 281, 289, 305/312). Jeter was not prescribed glaucoma medications (Doc. 8-1, p. 301/312). In 2013, Jeter's vision with correction (glasses) was 20/25 in both eyes (Doc. 8-1, p. 283/312). In 2015, Jeter's vision with correction was 20/25 in her right eye and 20/20 in her left eye (and 20/40 in both eyes with her current glasses) (Doc. 8-1, p .302/312).

In February 2015, Dr. Remedios noted Jeter's blood pressure was 106/71, and she had been diagnosed with Lyme disease. (Doc. 8-1, p. 308/312). Dr. Donovan was treating the Lyme disease and Jeter was making significant improvement–she was no longer falling and had more energy (Doc. 8-1, p. 308/312). Jeter still had hypothyroidism, high cholesterol, hypertension, and vitamin D deficiency (Doc. 8-1, p. 308/312).

In June 2015, Dr. Remedios found Jeter's blood pressure was 149/75, and she weighed 177 pounds (Doc. 8-1, p. 307/312). Dr. Remedios encouraged Jeter to return to Dr. Donovan for her complaints of increased fatigue, which he believed was due to the Lyme disease (Doc. 8-1, p. 307/312).

C.    2016 Administrative Hearing

Jeter appeared at her June 2015 administrative hearing with her representative and a vocational expert ("VE"). Jeter testified that she was 52 years old, and had a tenth grade education and a GED (Doc. 8-1, p. 32/312). Jeter can calculate correct change, but has difficulty concentrating for more difficult math

8

problems (Doc. 8-1, p. 32/312).  Jeter can read for short periods of time (Doc. 8-1, p. 33/312).

Jeter further testified that she is 5' 4" tall and weighs 175 pounds (Doc. 8-1, p. 33/312).  She is right-handed and has a driver's license (Doc. 8-1, p. 33/312).  Jeter cannot drive very far, or for more than an hour, due to fatigue (Doc. 8-1, p. 33/312).

Jeter last worked at a part time job for about two months in 2005, cleaning her church (Doc. 8-1, p. 34/312).   In 2005, Jeter earned a total of $385 (Doc. 8-1, p. 34/312).  Currently, Jeter lives on her late husband's life insurance, his pension (about $500 per month), and his retirement (until it is gone) (Doc. 8-1, p. 50/312).

Jeter testified that she cannot work due to severe fatigue (Doc. 8-1, p. 34/312).  Jeter can walk with assistance (such as using a cart to lean on while she shops) (Doc. 8-1, p. 34/312).  Jeter shops about once a week (Doc. 8-1, p. 34/312).  Jeter was originally diagnosed with fibromyalgia, which caused the fatigue (Doc. 8-1, p. 34/312).  However, a year ago Dr. Timothy Donovan told her she suffers from fatigue due to Lyme disease, and tests confirmed that diagnosis (Doc. 8-1, p. 35/312).

Jeter began treatment for Lyme disease (antibiotics) in about August 2014 and is getting better (Doc. 8-1, p. 35/312). Jeter testified that she can go to Walmart now and shop for brief periods (Doc. 8-1, p. 35/312).  However, her balance is still bad so she has to be careful not to fall over when she walks (Doc. 8-1, p. 35/312).  Jeter recently began treatment for Babesia, which is "like malaria" and is connected to her Lyme disease[4] (Doc. 8-1, p. 36/312).  Babesia is treated with malaria drugs and an

---

[4] Babesiosis or Babesia microti is, like Lyme disease, spread by blacklegged ticks.

antibiotic (Doc. 8-1, p. 36/312).  Jeter sees Dr. Donovan every two to three months (Doc. 8-1, p. 35/312).  Dr. Donovan also diagnosed Jeter's hypothyroidism in February 2015, which he is successfully treating with medication (Doc, 8-1, p. 37/312).  Dr. Donovan checks her thyroid every three months (Doc. 8-1, p. 37/312).  Jeter testified that she last saw Dr. Donovan in May 2015, but her last medical record with him is for February 2015 (Doc, 8-1, p. 36/312).

Jeter testified that her fatigue is worse some days than others, and is triggered by things like going places (Doc. 8-1, p. 38/312).  Jeter's Lyme disease has generally improved, but she had a setback in the last two months (Doc. 8-1, p. 39/312).

Jeter testified that her 35-year-old son and two grandchildren (4 and 8 years old) live with her (Doc. 8-1, pp. 39-40/312).  They moved in with her in September 2013, when her husband was still alive (Doc. 8-1, p. 50/312).  Jeter keeps her four-year-old grandchild during the day, and watches both grandchildren in the summer (Doc. 8-1, pp. 40, 50/312).  Jeter cooks easy meals, and her son also cooks (Doc. 8-1, p. 40/312).  Jeter and her son keep the house clean, and Jeter does the laundry (Doc. 8-1, pp. 40-41/312).  Jeter does not do yard work (Doc. 8-1, p. 41/312).  Jeter is able to shop as long as she has a buggy to hold on to for balance and does not stay too long (Doc. 8-1, p. 41/312).

Jeter has difficulty sleeping at night due to all-over, constant pain that fluctuates in intensity (Doc. 8-1, p. 42/312).  Jeter testified that her pain is usually worse in her arms and legs (Doc. 8-1, p. 42/312).  Jeter testified that she has been in a few accidents and undergone physical therapy (Doc. 8-1, p. 42/312).  Jeter has pain

in her back several times a week, but does not have problems with her neck (Doc. 8-1, p. 42/312).  The pain in her back prevents her from sleeping sometimes, but laying in a tub of hot water alleviates it (Doc. 8-1, p. 42/312).  Jeter's back pain does not travel down her legs or hips (Doc. 8-1, p. 41/312).  On a scale of one (least pain) to ten (most pain), Jeter's pain fluctuates between four and eight (Doc. 8-1, p. 42/312).

Jeter's hypertension is managed with medication (Doc. 8-1, p. 43/312).

Jeter testified that she can stand for about ten minutes before she starts to feel weak, start sweating, and feel like she might pass out (Doc. 8-1, p. 43/312).  Jeter does not walk far without support because she will fall if she steps on something (Doc. 8-1, p. 44/312).  Jeter can pick up 30 pounds, but cannot carry 30 pounds (Doc. 8-1, p. 44/312).  Jeter testified that she can pick up and carry 10 pounds occasionally (Doc. 8-1, p. 44-45/312).  Jeter has muscle spasms in her legs when she exerts herself (Doc. 8-1, p. 48/312).

Jeter has been diagnosed with sleep apnea and uses a C-PAP machine, which helps her sleep (Doc. 8-1, p. 45/312).

Jeter testified that she does not sleep during the day because she has to watch her grandchildren (Doc. 8-1, p. 45/312).  Jeter's son is home in the evenings and on the weekends (Doc. 8-1, p. 46/312).  If she needs a break during the week, her daughter might watch the children for a day or two (Doc. 8-1, p. 45/312).

Jeter testified that her hands are uncoordinated, she drops things, and she has trouble buttoning small buttons and manipulating small things (Doc. 8-1, p. 46/312).  Jeter has the same type of problem with her legs (Doc. 8-1, p. 46/312).

Jeter had a mild stroke in 2014, which left her right side weak (Doc. 8-1, p. 46/312). Jeter's right leg gives out on her sometimes, causing her to stumble (Doc. 8-1, p. 46/312). After the TIA (Transient Ischemic Attack), Jeter was put in a sleep study, her CPAP machine was reset, and she was prescribed daily aspirin (Doc. 8-1, p. 47/312). Physical therapy was also recommended, but Jeter did not do it because she did not have anyone to watch her grandchildren regularly while she went to physical therapy (Doc. 8-1, p. 48/312). Jeter also thought that physical therapy would cause too much fatigue (Doc. 8-1, p. 48/312).

Jeter testified that she has problems concentrating and remembering things, such as whether she took her medicine (Doc. 8-1, p. 48/312).

Jeter does not drink alcohol, smoke, or use drugs that are not prescribed for her (Doc. 8-1, p. 50/312).

The VE testified that Jeter has no past relevant work (Doc. 8-1, p. 51/312). The VE testified that, if a person with Jeter's age, education, and work history can lift/carry 10 to 15 pounds, and alternate sitting and standing for 10 minutes at a time, she would not be able to do any light work, but would be able to do some sedentary work[5] (Doc. 8-1, p. 52/312). The VE further testified that, if such a person had difficulty with concentration and memory that caused her to be off-task 20% of the working day, there would not be any jobs she could do at any exertional level (Doc. 8-1, p. 53/312). If the person has chronic fatigue and needs to lie down or recline

---

[5] Jeter's representative posed the hypothetical questions to the VE. The ALJ did not pose any hypotheticals. No one asked the VE to specify jobs Jeter could do given the limitations set forth in the hypothetical.

occasionally through the work day (up to one-third of the day), there would not be any jobs she could do at any exertional level (Doc. 8-1, p. 53/312).  Finally, if the person suffers an exacerbation of her condition that causes her to miss work or leave work early about three days a month, there would not be any job she could do and keep (Doc. 8-1, p. 53/312).

     **D.**    <u>**ALJ's Findings**</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Jeter (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  <u>See</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  <u>See</u> <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found that Jeter is the unmarried widow of the deceased insured worker and has attained the age of 50, so she meets the non-disability requirements for disabled widow's benefits (Doc. 8-1, p. 17/312).  The ALJ found that Jeter has not engaged in substantial gainful activity since August 1, 2011 (Doc. 8-1, p. 17/312).  The ALJ further found that, although Jeter suffers from "open and with borderline glaucoma findings, cataract, hypothyroidism, obstructive sleep apnea, hypertension, fibromyalgia, and a history of TIA/mild stroke (possibly related to her MTHFR genetic defect)," she does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months (Doc. 8-1, pp. 17-18/312).

The ALJ concluded that, since Jeter does not have a severe impairment, she was not under a disability from August 1, 2011 through the date of her decision on October 23, 2015 (Doc. 8-1, pp. 18, 24/312).  The sequential analysis thus ended at Step 4, with a finding that Jeter was not disabled (Doc. 8-1, p. 24/312).

II.    **Law and Analysis**

A.    **Eligibility for Benefits**

The Social Security Act established a three-pronged test for eligibility for disabled widow's benefits.  To qualify for disabled widow's benefits, a claimant must establish that she is not married, is between 50 and 60 years old, and has a physical or mental impairment or impairments that, under the regulations promulgated by the Commissioner, are deemed to be so severe as to preclude her from engaging in

any gainful activity. Also, the claimant must show her disability began no later than seven years after the wage earner's death or seven years after she was last entitled to survivor's benefits. 42 U.S.C. § 402(e); 20 C.F.R. § 404.335.

B.   Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision, and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th

15

Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### C.    Substantial evidence supports the ALJ's finding that Jeter is not disabled.

#### 1.    The ALJ's error as to Jeter's work history does not affect her finding that Jeter is not disabled.

Jeter contends the ALJ erred in finding she has worked for the last 15 years cleaning her church and earning $385 per month.

Jeter's representative asked her if she has worked any in the last 15 years (Doc. 8-1, p. 34/312). Jeter testified, and her earning record shows, that the only work she did was cleaning her church for two months in 2005, for which she earned a total of $385 (Doc. 8-1, pp. 34, 125/312). However, the ALJ stated in her decision: "At the hearing, the claimant reported for the last 15 years, she performed cleaning at her church and was paid $385.00 a month." (Doc. 8-1, p. 23/312).

The ALJ also found, contradictorily, that Jeter had not worked since her alleged onset date in 2011. Therefore, despite the erroneous statement in her decision as to Jeter's work history, the ALJ found Jeter had not been working since (at least) 2011. Therefore, Jeter was not prejudiced by the ALJ's erroneous statement as to her work history.

16

2.    <u>**The ALJ did not err in finding Jeter does not have severe vision problems.**</u>

Next, Jeter contends the ALJ erred in finding she wears contact lenses and has 20/20 vision, since she wears glasses and has 20/40 vision with correction.

In 2015, Jeter's vision with correction was 20/25 in her right eye and 20/20 in her left eye with correction (Doc. 8-1, p .302/312). However, Jeter's vision with her current glasses was only 20/40 because she needed a new lens prescription (Doc. 8-1, p .302/312). Therefore, although the ALJ erred in stating that Jeter wears contact lenses, she did not err in concluding that Jeter does not have a severe vision problem.

3.    <u>**The ALJ did not err in finding Jeter does not have arthritis.**</u>

Jeter contends the ALJ erred in finding she was not diagnosed with arthritis. Jeter contends she was diagnosed with polyarthritis and carpal tunnel syndrome by Dr. Donovan.

In her decision, the ALJ stated that Jeter was not diagnosed with arthritis (Doc. 8-1, p. 20/312).

First, it is noted that carpal tunnel syndrome is not a form of arthritis.[6]

In June and July 2014, Dr. Donovan mentioned unspecified poly arthropathy or polyarthritis. A diagnosis of arthritis is not supported by objective medical

_____

[6] The carpal tunnel is a narrow passageway of ligament and bones at the base of your hand. It contains nerve and tendons. Sometimes, thickening from irritated tendons or other swelling narrows the tunnel and causes the nerve to be compressed. Symptoms usually start gradually. As they worsen, grasping objects can become difficult. Often, the cause is having a smaller carpal tunnel than other people do. Other causes include performing assembly line work, wrist injury, or swelling due to certain diseases, such as rheumatoid arthritis. Women are three times more likely to have carpal tunnel syndrome than men. MEDLINEplus Health Information, Health Topics: Carpal Tunnel Syndrome (also called Median nerve entrapment), *available at* https://medlineplus.gov/arthritis.html#cat_92 (a service of the U.S. National Library of Medicine and the National Institutes of Health).

evidence.[7]  There are no medical tests or medical findings by Dr. Donovan in the record to support a diagnosis of arthritis.  Moreover, Dr. Donovan's diagnosis appears to have been a working diagnosis only because he never determined and stated definitively that Jeter has arthritis (or poly arthropathy).

Therefore, the ALJ properly rejected Jeter's claim that she has arthritis.

### 4.    The ALJ did not err in stating that Jeter takes care of her grandchildren.

Jeter contends the ALJ erred in finding Jeter has cared for her two grandchildren since September 2013.  Jeter's grandchildren and their father lived with her at that time, and Jeter alleges she assisted with the children in only a limited manner.

Jeter testified that her 35-year-old son and two grandchildren (4 and 8 years old) live with her (Doc. 8-1, pp. 39-40/312).  They moved in with her in September 2013, when her husband was still alive (Doc. 8-1, p. 50/312).  Jeter keeps her four-year-old grandchild during the day, and watches both grandchildren in the summer (Doc. 8-1, pp. 40, 50/312).  Jeter further testified that she cooks easy meals, she and her son clean the house, and Jeter does the laundry (Doc. 8-1, pp. 40-41/312).[8]  Jeter

---

[7] Tests for arthritis include arthrography, bone x-rays, C-Reactive Protein test, an MRI of the musculoskeletal system, and synovial fluid analysis.  MEDLINEplus Health Information, Health Topics: Arthritis, *available at* https://medlineplus.gov/arthritis.html#cat_92 (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[8] The ALJ noted that, in addition to keeping her two grandchildren that live in her home with their father, Jeter does laundry and occasionally cooks, and cleans her home at her own pace, grocery shops (holding onto the cart), takes care of her personal needs, feeds the family pets, drives, and has no difficulty with social activities (Doc. 8-1, p. 23/312).

testified that she cares for both children during the day in the summer, and her son is there in the evenings and on the weekends (Doc. 8-1, pp. 45-46/312).  When school is in session, Jeter takes care of the youngest child (Doc. 8-1, p. 50/312).

Although Jeter might have shared responsibility for caring for her grandchildren on weekdays when her husband was alive, Jeter's testimony clearly shows she is now responsible for taking care of her grandchildren during weekdays. The ALJ did not err in stating Jeter takes care of her grandchildren.

### 5.    The ALJ did not misstate Dr. Hajmurad's report of May 2, 2012.

Jeter argues the ALJ erred in stating that, on May 2, 2012, during a follow-up appointment, Dr. Hajmurad found she was doing well and taking her medication intermittently.  Jeter contends Dr. Hajmurad reported she was doing better but still had significant cervical spondylosis and degenerative disc disease, continued to need medication for pain, was taking her pain medication as needed (not on a regular basis), and was reporting for physical therapy.

The ALJ stated in her decision that: "On follow-up of May 2, 2012, Dr. Riad Hajmurad reported the claimant was doing fairly well on her current medication, which she did not take on a regular basis." (Doc. 8-1, p. 20/312).  Since that is exactly what Dr. Hajmurad stated, the ALJ did not repeat it incorrectly.

Dr. Hajmurad also noted Jeter's continued significant cervical spondylosis and degenerative disc disease in the lumbar area; she still has "some tenderness in the cervical and lumbar area but the medication seems to help"; she takes her medication for pain as needed; physical therapy was helping her; and she did not need injections

(Doc. 8-1, pp. 173-74/312).  Although Jeter apparently believes the ALJ down-played her spondylosis and degenerative disc disease, Dr. Hajmurad clearly did not find it was causing her significant pain.  The ALJ did not misstate or misconstrue Dr. Hajmurad's report.

### 6.   The ALJ's error in implying Jeter's TIA was caused by noncompliance with her C-PAP is harmless error.

Jeter contends the ALJ erred in finding she was admitted to St. Francis Cabrini Hospital for a stroke, where it was reported she was issued a C-PAP with which she was no longer compliant, although using it had improved her gait and weakness.  Jeter contends the references to her gait and weakness were unrelated to her C-PAP.

Jeter arrived at the hospital with complaints of some slurred speech, numbness, and weakness on the right side (Doc. 8-1, p. 237/312).  A CT scan of her brain was normal (Doc. 8-1, p. 237/312).  Jeter did not have facial weakness, and she had good strength in her upper extremities (Doc. 8-1, p. 237/312).   Jeter's discharge record from the hospital stated her weakness and unsteady gait had improved (Doc. 801, p. 239/312).  No mention was made of her C-PAP.  A report by Dr. Gerald L. Foret, Jr. noted confirmation that Jeter had suffered a TIA, and further noted she had previously undergone a sleep study and been issued a CPAP that she used for a while, but had become non-compliant (Doc. 8-1, p. 255/312).  Dr. Foret wrote that Jeter needed to resume her C-PAP (positive airway pressure) treatment to attenuate her risk factors for another TIA or stroke (Doc. 8-1, p. 256/312).

The ALJ noted that, upon arrival at the hospital, Jeter gave a history of having undergone a sleep study, and received a C-PAP that she used for a while but had stopped using (Doc. 8-1, p. 21/312).  The ALJ also stated that "[Jeter's] weakness improved and her unsteady gait improved, after using the C-PAP." (Doc. 88-1, p. 21/312).  That was a misstatement.  The notation regarding the improvement in Jeter's weakness and unsteady gait did not have anything to do with C-PAP treatment, nor was C-PAP treatment mentioned (Doc. 8-1, p. 239/312).  Therefore, the ALJ erred in implying Jeter's condition was due to non-compliance with her C-PAP treatment.

However, that error occurred in conjunction with Jeter's TIA, which did not cause any residual deficits.  Jeter's current medical problems, on which she is basing her disability claim, do not have anything to do with her TIA.  Therefore, Jeter was not prejudiced by the ALJ's error as to her TIA medical history.

### 7.    The ALJ did not err in finding Jeter's hypothyroidism is a non-severe impairment, and Jeter was not prejudiced by the ALJ"s misstatement.

Jeter contends the ALJ erred in finding she has a diagnosis of hypothyroidism that does not indicate other symptoms such as hair loss, sensitivity to cold, constipation, or dry skin.  Jeter further contends the ALJ erred in stating she was prescribed medication for her hypothyroidism that was non-therapeutic.  Jeter argues the medical records note symptoms of fatigue, pain, muscle weakness, tenderness, stiffness, heavier than normal menstrual periods, and impaired memory which, she alleges, are all symptoms of hypothyroidism.  Jeter also contends her medication was

once erroneously refilled at the wrong dosage, which suppressed her TSH levels at that time, but it is therapeutic in the correct dosage.

Symptoms for hypothyroidism can vary from person to person and may include: fatigue; weight gain; a puffy face; cold intolerance; joint and muscle pain; constipation; dry skin; dry, thinning hair; decreased sweating; heavy or irregular menstrual periods; fertility problems; depression; and slowed heart rate.[9]  Obviously, everyone does not have every symptom.  It appears the ALJ rhetorically listed a few of the symptoms Jeter does not have.  Since the ALJ found that Jeter suffers from hypothyroidism,[10] and the medical evidence supports Jeter's diagnosis, Jeter was not prejudiced by the list of symptoms she does not have.

Moreover, since the ALJ found that Jeter's hypothyroidism is non-severe (Doc. 8-1, p. 20/312), it is implicit that she found it is controlled by medication.  Although the ALJ referred to one medical record which showed the medication had suppressed her TSH level (Doc. 8-1, pp. 21, 311/312), that appears to have been due to an incorrect medication dosage (Doc. 8-1, p. 310/312).  Jeter's medical records indicate that, after her dosage was adjusted, her TSH level rose again (Doc. 8-1, p. 308/312).  Therefore, Jeter's medication was therapeutic and controlled her hypothyroidism.

---

[9] See MEDLINEplus Health Information, Health Topics: Hypothyroidism, *available at* https://medlineplus.gov/hypothyroidism.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[10] The ALJ did not find that Jeter's hypothyroidism is a severe impairment.  An impairment is non-severe if it is based on a slight abnormality having such minimal effect as would not be expected to interfere with "ability to work, irrespective of age, education or work experience." See Loza v. Apfel, 219 F.3d 378, 392 (5th Cir. 2000) (citing Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985).

Since Jeter's treating physicians have not imposed any work limitations on Jeter due to her hypothyroidism (or for any other medical condition), substantial evidence supports the ALJ's finding that Jeter's hypothyroidism is not a severe impairment.  Jeter was not prejudiced by the ALJ's misstatement regarding her medication being non-therapeutic.

> **8.    The ALJ did not err in finding the diagnosis of fibromyalgia is unsupported.**

Jeter contends the ALJ erred in finding the diagnosis of fibromyalgia was not supported by trigger points.  Jeter contends Dr. Hajmurad treated Jeter for fibromyalgia due to her reported trigger points in the cervical area, back, arms, thighs, and feet.  The ALJ found, in Dr. Donovan's medical records, that "[f]ibromyalgia was mentioned, but no trigger point areas were discussed."  (Doc. 8-1, p. 21/312).

Jeter's burden is to prove she is disabled within the meaning of the Social Security Act.  That requirement means that she must show a "medically determinable" impairment and that she is unable "to engage in substantial gainful activity".  See Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).

Pursuant to Social Security Ruling ("SSR") 12-2p, fibromyalgia is a medically determinable impairment "when it is established by appropriate medical evidence." See Mayeux v. Comm'r of Soc. Sec. Admin., 2018 WL 297588, at *3 (M.D. La. 2018) (citing S.S.R. 12-2p: "Evaluation of Fibromyalgia", 2012 WL 3104869).  Ruling 12-2p

23

clarifies that a "physician's diagnosis alone" is insufficient, and that "[t]he evidence must document that the physician reviewed the person's medical history and conducted a physical exam." See id. Under Ruling 12-2p, a claimant will be found to have fibromyalgia when, in addition to a diagnosis, a physician provides evidence described in section II.A or II.B of the Ruling. See id.; see also Tebyanian v. Colvin, 2015 WL 4475762, at * 7 (N.D. Tex. 2015) ("Ruling 12-2p offers two tests for determining whether a claimant's fibromyalgia qualifies as a medically determinable impairment."). Under either test, a claimant must show: (1) a history of widespread pain "in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months"; and (2) evidence that other disorders that could cause symptoms and signs were excluded. See id. In addition to these two requirements, under the first test, the claimant must also show at least 11 positive tender points during a physical exam. See id. Under the second test, a claimant instead must show "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." See id.

There are no medical records from Dr. Hajmurad (or any other physician) relating to medical findings to support a diagnosis of fibromyalgia, or treatment for fibromyalgia. Dr. Hajmurad treated Jeter for back and neck pain caused by cervical spondylosis and degenerative disc disease (Doc. 8-1, pp. 174-/312).

24

Dr. Remedios noted that Jeter's neurologist had told her she *possibly* has fibromyalgia (Doc. 8-1, p. 311/312).  Jeter's medical history at the hospital in 2014 showed fibromyalgia (Doc. 8-1, p. 239/312).  Jeter herself testified that, until last year, she thought she had fibromyalgia, but Dr. Donovan told her she had Lyme disease (Doc. 8-1, p. 35/312).

There is no objective medical evidence in the record to supports a diagnosis of fibromyalgia and shows Jeter meets either test for fibromyalgia.  Therefore, the ALJ did not err in stating the diagnosis of fibromyalgia is not supported by trigger points.

### 9.    The ALJ did not err in noting that Jeter's pain and energy levels had improved.

Next, Jeter contends the ALJ erred in finding Jeter's pain was reduced and her energy was increased in November 2014 and February 2015.  Jeter contends the medical records showed continued complaints of fatigue, chronic pain, and weakness.

On August 5, 2014, Dr. Donovan noted that Jeter had decreased pain and increased energy (Doc. 8-1, p. 259.312).  In February 2015, Dr. Donovan noted that Jeter's pain level was down, her fatigue was reduced, and she was more active socially (Doc 8-1, pp. 262/312).  In February 2015, Dr. Remedios also noted that Jeter had more energy (Doc. 8-1, p. 308/312).

Although the medical records show Jeter still suffers from fatigue, pain, and weakness, they noted Jeter had improved with treatment.[11]  The ALJ did not err in stating Jeter's symptoms had improved.

---

[11] The mere existence of pain is not an automatic ground for obtaining disability benefits.  The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence.  See Fortenberry

25

### 10. Jeter did not carry her burden of proving she has a severe mental impairment.

Jeter argues the ALJ erred in finding Jeter's medical records do not reflect any treatment for a medically determinable mental impairment. Jeter contends she suffers from "fibro fog," a symptom of fibromyalgia that refers to concentration and memory problems, which was documented by Dr. Donovan multiple times.

"Fibro fog" refers to the cognitive or memory problems that can be a symptom of fibromyalgia. See Mayeux, 2018 WL 297588, at *3 (citing S.S.R. 12-2p: "Evaluation of Fibromyalgia", 2012 WL 3104869). The Disability Determinations Services (state) examiner (Dr. Judith Levy, Ph.D.) evaluated Jeter's complaints concerning problems with memory and concentration, and concluded that Jeter does not have a medically determinable mental impairment (Doc. 8-1, pp. 60-61/312). The medical evidence in the administrative record does not show that Jeter's symptoms concerning memory and concentration ("fibro fog") are severe enough to rise to the level of a medically determinable severe mental impairment requiring nonexertional limitations.

Therefore, the ALJ did not err in finding Jeter's medical records do not show she suffers from a medically determinable mental impairment.

### 11. It was not necessary for the ALJ to discuss Jeter's non-disabling medical problems.

Finally, Jeter contends the ALJ erred in finding there were no diagnoses of: plantar fasciitis and spurs in her feet; frequent vaginal yeast infections with pain;

---

v. Harris, 612 F.2d 947, 950 (5th Cir. 1980). Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2000).

prediabetes (now diabetes); and restless leg syndrome.  Jeter contends Dr. Hajmurad made those diagnoses.

The ALJ did not conclude that Jeter had never been diagnosed with those medical problems.  Rather, the ALJ did not discuss them because Jeter did not claim they are disabling, and the medical evidence does not indicate otherwise.  There was no reason for ALJ to discuss all of Jeter's previous, non-disabling medical problems.

## III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Jeter's appeal be denied and dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __29th__ day of August, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge